United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DONNA L. SNYDER,

        Plaintiff,

  v.

JO ANNE B. BARNHART, Commissioner,

        Defendant.

_____/

No. C 04-03844 CRB

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

     The instant case involves plaintiff's challenge to defendant's denial of plaintiff's Disability Insurance Benefits claim. Plaintiff's challenge to the controlling decision of the Administrative Law Judge (ALJ) rests on several assertions. First, plaintiff avers that the ALJ's determination that plaintiff's medical conditions do not meet or equal the criteria required by agency regulations is factually and legally erroneous. In particular, plaintiff takes issue with what is described as a misstatement by the ALJ of certain medical expert testimony relating directly to the equivalency question. Second, plaintiff asserts that the ALJ erred in rejecting or ignoring credible evidence relating to the impact of plaintiff's psychological condition on her ability to perform work. Plaintiff claims that the ALJ's failure to take this evidence into account rested on factually inadequate bases and amounted to legal error.

/ / /

1    After carefully considering the papers submitted by the parties and closely analyzing

2    the administrative record, the Court concludes that plaintiff's motion for remand is

3    GRANTED, and defendant's cross-motion for summary judgment is DENIED.

4                              **PROCEDURAL HISTORY**

5    Plaintiff filed an application for Disability Insurance Benefits pursuant to Title II and

6    Part A of Title XVIII of the Social Security Act, as amended (the Act), on January 8, 2001.

7    Tr. at 246-48.  Onset of the disability was claimed to have commenced on December 22,

8    2000.  Tr. at 246.  Her application was denied on initial review and again on reconsideration.

9    Tr. at 224-27, 229-32.  After making a proper request, plaintiff's claim was heard before an

10   ALJ on November 8, 2002.  Tr. at 529.  By written decision dated November 29, 2002, the

11   ALJ found that the plaintiff was not disabled and therefore denied her claim.  Tr. at 217-18.

12   In particular, the ALJ determined that while the plaintiff "suffers from idiopathic drop

13   attacks and anxiety which are severe," her ailments neither met nor equaled impairment

14   criteria.  Tr. at 217.  In addition, the ALJ found that she retains residual functional capacity to

15   perform a full range of sedentary exertional work, including her past relevant work.  Tr. at

16   217-18.

17   Plaintiff thereafter requested review of the ALJ decision by the agency Appeals

18   Council.  Tr. at 207-08.  By letter dated July 16, 2004, the Council denied plaintiff's request

19   for review, making the ALJ's decision final and binding.  Tr. at 5.  Pursuant to 42 U.S.C.

20   section 405(g), plaintiff thereafter filed this civil complaint against defendant on September

21   14, 2004.

22                              **FACTUAL BACKGROUND**

23   **A.  Plaintiff's Disability Claim**

24   As described by the ALJ, plaintiff based her claim for disability benefits on her having

25   suffered the effects of a closed head injury, memory loss, right-sided weakness, diabetes

26   mellitus and depression.  Additionally, plaintiff experiences on a regular basis "drop attacks,"

27   the cause of which doctors have been unable to diagnose despite abundant tests and extensive

28   monitoring.  Tr. at 212, 533-38.  During a typical attack, plaintiff will suddenly lose muscle

United States District Court

For the Northern District of California

2

1  control and fall from a standing position.  Tr. at 543-45, 551-52.  The drop attacks, which

2  have occurred on a regular basis since approximately 1998, have resulted in numerous

3  concussions and physical injuries.  Id.  The injuries, in turn, caused plaintiff to miss

4  numerous days of work and, according to plaintiff, precluded her from keeping a job.  Tr. at

5  543-50.

6  **B. Plaintiff's Testimony**

7  Plaintiff was 42 years of age at the time of the hearing, is a high school graduate, and

8  has experience working as a procurement clerk and administrative assistant.  Tr. at 212, 262,

9  544-48, 552-54.  The last job she held was a part-time position in which she took phone

10  messages.  Tr. at 547, 553.  Before that, she worked in a full-time position as an

11  administrative assistant.  Tr. at 545-46.  Both positions are described as being sedentary in

12  nature.  Tr. at 544, 547.

13  Since leaving the workforce, plaintiff will in a typical day drive her son to and from

14  school, perhaps make a trip to the supermarket, and cook dinner and perform other household

15  chores.  Tr. at 548.  Plaintiff asserts, however, that she always accomplishes these tasks with

16  help.  Id.  Plaintiff uses a walker approximately 90 percent of the time and will use a

17  wheelchair if she knows more extensive travel will be required.  Tr. at 556-57.  Plaintiff

18  retains the ability to legally operate an automobile.  Tr. at 541.

19  At the hearing, plaintiff testified to having experienced the drop attacks only while

20  standing.  Tr. at 541, 544.  Thus, although she had never "fallen down" while sitting and

21  working, she had apparently experienced attacks at work (while walking from her office to

22  the employer's warehouse) and en route to work (while walking to and from her car).  Tr. at

23  544.  On at least one occasion, plaintiff fell down at work, sustained face contusions and a

24  black eye, and missed several days of work.  Tr. at 545.  Plaintiff has additionally fallen at

25  the grocery store, at home, and in the shower.  Tr. at 544.  Plaintiff states that the attacks

26  come without warning.  Tr. at 551-52.

27  Plaintiff estimated that she had suffered 15 concussions secondary to drop attacks.  Tr.

28  at 545.  The concussions and other injuries sustained secondary to falls resulted in plaintiff

United States District Court

For the Northern District of California

3

United States District Court

For the Northern District of California

1   missing so many work days at her last full-time job that her supervisor requested that she

2   train another employee and agree to leave her position as administrative assistant.  Tr. at 546.

3   Plaintiff opines that she reluctantly agreed to the request.  Id.  Plaintiff states that she had to

4   quit her part-time job as a phone messenger because her workplace was located up stairs.  Tr.

5   at 547-58.

6          Plaintiff testified that, on average, she experiences a fall once a day.  Tr. at 550.  She

7   stated that she typically schedules a check-up with her doctor every six weeks, but that she

8   will make more frequent visits depending on her falls and the injuries she sustains therefrom.

9   Id.  She states that at least once or twice a month, her falls will occasion injury significant

10  enough to demand medical attention.  Id.  Likewise, plaintiff estimates that once or twice a

11  month, injuries sustained secondary to falls will prevent her from attending work the

12  following day.  Tr. at 554.  Indeed, plaintiff admitted at the hearing that she could probably

13  perform a sedentary job were it not for the injuries she sustains secondary to her falls.  Id.  As

14  plaintiff herself stated, the problem is "Not the job itself.  It's the missing the work after the

15  falls."  Id.

16         Prior to the onset of her drop attacks, plaintiff states that she was regularly and

17  gainfully employed, and that if she lost a job it would not take her long to find another.  Tr. at

18  548.  Plaintiff's application for disability insurance benefits, which includes plaintiff's yearly

19  earnings from 1984 through 1999, supports these contentions.  Tr. at 248.

20  **C.  Medical Evidence**

21         The record transcript contains an abundance of documents concerning plaintiff's

22  medical status.  The documents range from detailed reports written by her treating physician

23  and by other clinicians to brief notations regarding various tests and procedures.  In short,

24  there is much documentary evidence supporting plaintiff's contentions concerning her falls

25  and injuries.

26  / / /

27  / / /

28  / / /

4

United States District Court

For the Northern District of California

1     1.  <u>Treatment Received at the San Jose Medical Group</u>

2        On May 23, 2000, while under the care of Dr. Laura Simpson, MD, at the San Jose

3 Medical Group, plaintiff was examined for having fallen down. Plaintiff had hit her head

4 and complained of a nosebleed. Tr. at 338. As part of her report, Dr. Simpson noted

5 "repetitive concussions"and appeared to suggest the need for a CT exam. <u>Id.</u>

6        In July 2000, plaintiff was treated for a foot and leg injury that was also sustained in a

7 fall. Tr. at 331. Her leg was placed in a cast. Tr. at 332. The treating physician, Dr. Julie

8 Miller, D.P.M., described plaintiff as "a 39-year-old female with cataplexy status post fall . .

9 ."[1] Plaintiff returned for treatment four days after her casting to complain of increased falls,

10 which were occurring at the rate of approximately one per day. Tr. at 330. Dr. Simpson

11 noted that the falls seemed related to increased stress. <u>Id.</u>

12        Thereafter, in September and October, plaintiff visited the San Jose Medical Group

13 several more times, complaining of falls, headaches and anxiety. Tr. at 322-28. A CT scan

14 on plaintiff was negative. Tr. at 325. Dr. Simpson again diagnosed cataplexy and

15 recommended the use of a wheelchair. <u>Id.</u>

16     2.  <u>Treatment Received at Kaiser Permanente</u>

17        Plaintiff visited Kaiser on December 15 and again on December 25, both times

18 complaining of her falls. Tr. 364, 362. At the latter visit, plaintiff was described by Dr.

19 Michael F. Matsumoto as suffering from cataplexy, double vision, vomiting, and other

20 ailments.[2] Tr. at 362. Plaintiff's diabetes was also noted. <u>Id.</u> A CT scan taken that same

21 day was normal. Tr. at 361.

22        Plaintiff visited Kaiser on January 2 and 18, 2001, complaining on both occasions

23 about having fallen. Tr. at 458-60. It was noted on the January 18 medical report that

24 plaintiff hit her face in the fall. Tr. at 458. On February 7, 2001, Plaintiff underwent a

25

---

26     [1] According to Merriam-Webster Online, cataplexy is defined as a "sudden loss of muscle
power following a strong emotional stimulus."

27

28     [2] Although Dr. Matsumoto was listed as plaintiff's primary care giver beginning in
December 2000, tr. at 362, 344, plaintiff received care from numerous Kaiser physicians and
interns throughout the period in question.

**United States District Court**

For the Northern District of California

1   neurological exam by Dr. Rajan Bhandari.  Tr. at 456.  The exam showed no neurological

2   abnormalities, and plaintiff was described as having "a normal orientation [and] memory . . ."

3   Id.  The report also noted that plaintiff's work-up "included several normal CT and MRI

4   Brain Scans, EEGs and Sleep studies including studies for narcolepsy, Tilt Table testing,

5   EKGs and TMT."  Id.  Significantly, Dr. Bhandari concluded that plaintiff's attacks were

6   "idiopathic,"[3] and that "Cataplexy is a symptom and not a diagnosis."  Id.

7        Between March 9 and May 17, plaintiff returned to Kaiser on at least five separate

8   occasions.  See tr. at 357, 454-55, 353, 450-51, 352, 448.  In these visits, plaintiff

9   complained of either increased falls or injuries sustained secondary to falls.  Id.  June saw

10  plaintiff visit Kaiser another four or five times to report of falls and/or injury secondary to

11  falls.  See tr. at 350-52, 346-49, 445.  Throughout this period, plaintiff was taking an

12  antidepressant (Paxil) in addition to Vicodin and Motrin for pain.  Tr. at 350, 352.

13       After reporting another fall and injury on September 7, see tr. at 440-42, plaintiff

14  returned on October 15 to complain of having hit her head as a result of a fall.  Tr. at 439.  A

15  CT scan taken of plaintiff's brain that same day was described in a report as "unremarkable."

16  Tr. at 444.  Plaintiff continued to report falls and injuries throughout November and

17  December of 2001 and into January 2002.  See tr. at 432-35, 423, 427-29, 425-26.  Another

18  CT scan taken on December 25, 2000 revealed no abnormalities.  Tr. at 431.  A CT scan on

19  January 31, 2002 and an echocardiogram dated March 11 were normal.  Tr. at 414, 413.

20       Plaintiff underwent Bariatric surgery in March 2002 and had lost approximately 60

21  pounds by September 2002.  Tr. At 504.  CT scans of her brain, abdomen, pelvis, and chest

22  taken in June and July 2002 were determined to be normal.  Tr. at 513-15.  Nevertheless,

23  plaintiff's falls and injuries continued.  Plaintiff reported injuries secondary to falls on July

24  18, August 23 and September 10, 18, and 23.  Tr. at 485-86; 494-96; 504-07.  Documents

25  suggest plaintiff reported additional fall injuries throughout this time, but dates were not

26

27

28        [3]  Idiopathic is defined as "arising spontaneously or from an obscure or unknown cause."
          In other words, Dr. Bhandari concluded that the cause of plaintiff's drop attacks is unknown.

6

United States District Court

For the Northern District of California

1   clearly marked on a number of the forms.  Tr. 476-84; 490-92; 499.  On one occasion,

2   plaintiff fell on stairs and sustained an injury to her hip.  Tr. at 499.

3       3.   <u>Further Findings by Primary Care Giver Dr. Matsumoto</u>

4       As noted above, Dr. Michael F. Matsumoto, MD, has served as plaintiff's primary

5   care provider since December 2000.  <u>See</u> tr. at 362, 344.  In a letter addressed to plaintiff's

6   attorneys and dated November 5, 2001, Dr. Matsumoto concurred with the opinion of the

7   Kaiser neurological department that plaintiff's drop attacks were idiopathic in nature.  Tr. at

8   344.  Matsumoto noted that the attacks had "resulted in myalgias and concussions."  <u>Id.</u>  He

9   additionally opined that plaintiff's falls had increased despite frequent and close monitoring,

10  that it was highly likely that her falls would continue into the indefinite future, and that

11  plaintiff was "not able to do any type of prolonged physical activity because of these falls

12  and the effects of the falls."  Tr. at 344-45.  Dr. Matsumoto also, however, stated that

13  plaintiff's diabetes could be "well controlled with dietary measures and medication."  Tr. at

14  345.

15      In a Multiple Impairments Questionnaire dated June 17, 2002, Dr. Matsumoto listed

16  "idiopathic drop attacks," diabetes and morbid obesity as plaintiff's conditions.  Tr. at 468.

17  In regard to plaintiff's symptoms, Matsumoto stated: "Due to recurrent falls, patient with

18  headaches, and multiple muskuloskeletal pains," and indicated that these symptoms were

19  consistent with her physical and emotional impairments.  Tr. at 469.  He described plaintiff's

20  pain as "persistent," "daily, regular," and "constant."  Tr. at 469-70, 473.  When asked on the

21  questionnaire what plaintiff's residual functional capacity in a competitive five day a week

22  work environment would be, Dr. Matsumoto indicated that plaintiff could sit from 0-1 hour

23  and could stand or walk from 0-1 hour.  Tr. at 470.  He also indicated that it would be

24  medically necessary for plaintiff not to sit continuously in her work setting and that she

25  would have to get up and move about frequently.  <u>Id.</u>

26      Moreover, Matsumoto indicated that plaintiff could lift or carry 0-5 pounds of weight

27  "occasionally" and should never lift or carry any more.  Tr. at 471.  "Ongoing

28  muskuloskeletal symptoms," according to Dr. Matsumoto, make repetitive motion "difficult"

7

for plaintiff.  Id.  He indicated that plaintiff's degree of limitation in a competitive 8-hour workday as "marked," or "essentially precluded."  Id.  He noted that plaintiff's symptoms would likely increase if she were placed in a competitive work environment and that her condition essentially precluded her from working in a job that required her to keep her head in position to look at a computer screen or down at a desk.  Tr. at 472-73.  Matsumoto suggested that plaintiff's anxiety was an affecting emotional factor and that plaintiff was not a "malingerer."  Tr. at 473.  He indicated that plaintiff was capable of handling low stress, that her impairments would likely result in missed work days more than three times a month, and that her condition would continue indefinitely.  Tr. at 473-74.

Dr. Matsumoto completed a second Impairments Questionnaire on October 14, 2002, this time relating to plaintiff's mental state.  Tr. at 516-23.  Matsumoto's diagnosis consisted of "idiopathic drop attacks; diabetes mellitus; anxiety/depression."  Tr. at 516.  Dr. Matsumoto's clinical findings concluded, amongst other things, that plaintiff suffers from poor memory, appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional lability, delusions, recurrent panic attacks, psychomotor agitation, feelings of guilt or worthlessness, difficulty thinking, oddities of thought, perceptual disturbance, isolation, illogical thinking, and generalized persistent anxiety.  Tr. at 517.  He noted that plaintiff's drop attacks continued and that her anxiety symptoms were not controlled.  Tr. at 518.

Additionally, Dr. Matsumoto listed as "markedly limited" plaintiff's ability to carry out instructions, maintain attention or concentration, perform within a schedule, complete a normal workweek without psychologically based symptoms intruding, interact with the general public, and get along with co-workers.  Tr. at 519-21.  The doctor noted that anxiety flare would cause plaintiff's work abilities to deteriorate further.  Tr. at 521.  At the time, plaintiff continued to take Paxil for depression, Hydrocodine for pain, and was about to start the drug Topamax for migraine prevention.  Id.  Matsumoto concluded that plaintiff's condition was expected to continue for at least 12 months, that her psychological condition exacerbated her physical symptoms, and that plaintiff was not a malingerer.  Tr. at 522.  He stated that plaintiff could not handle even low stress work because it was "likely" that the

"falling spells would increase." Id.  He rated plaintiff's Global Assessment of Function (GAF) index at 40-50.[4]  Tr. at 516.

### 4. Dr. Rana's Neurological Evaluation

On March 28, 2001, plaintiff was examined by Dr. Farah M. Rana, M.D., Neurology. Tr. at 365-70.  Plaintiff's ailments are described as including drop attacks, injuries from those attacks, memory problems, and depression.  Tr. at 365-66.  Besides noting some "strange affect during her mini mental examination," including constant "smiling and laughing" and being unable to name the president, plaintiff scored a 29 out of 30 on the mental exam.  Tr. at 369.  Still, Dr. Rana indicated that plaintiff suffered memory problems and suggested that they may be secondary to her depression.  Tr. at 369.  At any rate, Dr. Rana concluded that plaintiff did not have any comprehensive or communication deficits, had the ability to walk and/or stand with breaks for 6 hours, could carry 20 pounds consistently and 40 pounds occasionally, and did not need any assistive devices.  Plaintiff, however, was noted to have problems bending, stooping, reaching, or climbing.  Tr. at 370.

Dr. Rana also noted that plaintiff fell in the doorway to her office as she exited the exam.  Dr. Rana indicated that plaintiff's "mentation was completely in tact,"[5] that she talked and smiled before and after the fall, that she grabbed onto the side of the doorway to break her fall, and that no loss of muscle tone was noticed.  According to Dr. Rana, the fall did appear cataplexic and that her drop attacks may be psychogenic in nature.[6]

### 5. Physical Residual Functional Capacity Assessments

Two additional Physical Residual Functional Capacity Assessment forms were filled out for plaintiff, one on April 30, 2001 and one on September 21, 2001.  Tr. At 382-89; 374-81.  In the April assessment, one Dr. Samuel McFadden, M.D., concluded that plaintiff has

---

[4] According to a government website, "The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people over 18 years of age and older. It excludes physical and environmental impairment." See http://depts.washington.edu/wimirt/ GAF%20Index.htm.  A scoring of 40-50 indicates "Serious symptoms OR any serious impairment in social, occupational, or school functioning."  See id.

[5] According to Merriam-Webster Online, mentation is defined as "mental activity."

[6] Psychogenic is defined as "originating in the mind or in mental or emotional conflict."

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    few limitations in regard to her ability to lift or carry objects (50 pounds occasionally, 25

2    pounds frequently), stand and/or walk with normal breaks (6 hours in an 8-hour day), sit with

3    normal breaks (6 hours in an 8-hour day), or push or pull objects (unlimited, except as

4    otherwise indicated). Tr. at 383. Dr. McFadden concluded that plaintiff's obesity limited her

5    to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Tr. at 384.

6    Plaintiff's gross manipulation and fine manipulation (fingering) were described as "limited."

7    Because of her falls, Dr. McFadden suggested that plaintiff avoid even moderate exposure to

8    hazards such as machinery and heights. Tr. at 386.

9         The September assessment was completed by an M.D. who's name is illegible on the

10   form. Tr. at 381. The September assessment noted plaintiff as able to lift 40 pounds

11   occasionally and 20 pounds frequently. Tr. at 375. She was said to be able to frequently

12   balance, stoop kneel, etc. but was said never to be able to climb ladders, ropes or scaffolds.

13   Tr. at 376. No limitations were noted as to her hand or finger manipulation. Tr. at 377.

14   Very little additional information was included on the form. Tr. at 374-81.

15        6. Dr. Carella's Psychological Evaluation

16        On April 2, 2001, plaintiff was given a psychological evaluation by Clinical

17   Psychologist Dr. Paul Carella. Tr. at 371-73. He noted that plaintiff on assessment

18   "demonstrated low average functioning. On interview, she displayed transient anxiety and

19   mild depression. While she was able to understand and follow instructions, her manner of

20   presentation and recent history suggest there might be longstanding, personality attributes

21   that contribute to her cataplexy." Tr. at 373. His diagnostic impressions included reference

22   to dysthymia,[7] diabetes, and phychosocial and health issues. Id. He ruled out generalized

23   anxiety disorder and personality disorder. Id. Dr. Carella assessed plaintiff's GAF index at

24

25

26        [7] The DSM-III-R defines dysthymia or "depressive neurosis" as: "a chronic disturbance
     of mood involving depressed mood . . ., for most of the day more days than not, for at least two
27   years . . . . In addition, during these periods of depressed mood there are some of the following
     associated symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or
28   fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of
     hopelessness."

United States District Court

For the Northern District of California

65-75.[8]  Id.  On the three tests given to plaintiff--the Bender Gestalt, the Wechsler Adult Intelligence Scale, and the Wechsler Memory Scale--plaintiff scored borderline, low-average and low-average respectively.[9]

   7.  Dr. Smith's Mental Assessments

        On May 1, 2001, Dr. Craig A. Smith completed Mental Residual Functional Capacity Assessment form based on plaintiff's then-existing medical file.  Tr. at 390-92.  Dr. Smith indicated that, in most categories of mental functioning, plaintiff was not significantly limited.  Tr. at 390-91.  He assessed plaintiff as being moderately limited with regard to her ability to maintain attention and concentration and her ability to perform activities within a schedule.  Tr. at 390.  Dr. Smith assessed her ability to complete a normal workday or week without psychologically-based symptomatic interruption as somewhere between not significantly limited and moderately limited.  Tr. at 391.  He similarly assessed plaintiff's ability to interact appropriately with the public.  Id.  The only category of functioning that Dr. Smith saw no evidence of limitation at all was plaintiff's ability to accept instructions and respond appropriately to criticism.  Id.

        On the same day, Dr. Smith completed a Psychiatric Review Technique form.  Tr. at 394-405.  Dr. Smith diagnosed plaintiff with affective disorders, anxiety-related disorders, personality disorders, and dysthymia.  Tr. at 394; 397.  Dr. Smith described plaintiff's restriction in daily activity and ability to maintain social function as mildly limited.  Tr. at 404.  Plaintiff's ability to maintain concentration, persistence or pace was described as moderately limited.  Id.

/ / /

/ / /

        [8] A GAF assessed at 61-70 indicates "Some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  See http://depts.washington.edu/wimirt/GAF%20Index.htm.  A GAF index of 71-80 suggests that "If symptoms are present they are transient and expectable reactions to psychosocial stresses; no more than slight impairment in social, occupational, or school functioning."  See id.

        [9] Her performance on the Bender Gestalt indicated "poor organizational ability and poor perspective."  Tr. at 372.

**United States District Court**

For the Northern District of California

1    8.  <u>Medical Expert Testimony--Dr. David A. West</u>

2        Board certified internist and cardiologist Dr. David A. West, M.D. was called to

3    testify at the hearing before the ALJ.  <u>See</u> tr. at 529-42.  After indicating that he had reviewed

4    plaintiff's medical record, he stated his view that plaintiff may be eligible to be considered

5    for disability under Social Security impairment listing 11.02, the listing concerning epilepsy.

6    Tr. at 533.  He stated that although she does not have seizures, the intermittent drop attacks

7    would "accomplish the same end," making 11.02 "worth considering."[10]  Tr. at 533-34.  At

8    the same time, Dr. West stated that plaintiff did not "clearly meet" the listing.  Tr. at 534.

9        In regard to the cause of the drop attacks, Dr. West stated his belief that plaintiff's

10   condition could simply be idiopathic, as her doctors had concluded; that her condition could

11   be psychosomatic, that is, related to anxiety, depression or some other psychological issue; or

12   that her condition could be feigned.  Tr. at 533-36.  Dr. West described medical evidence

13   supporting the three possible conclusions, including the large number of tests indicative of

14   normal function, plaintiff's consultations with Dr. Matsumoto regarding her depression, and

15   the notable lack of indicia indicating that an actual medical condition triggered the fall in Dr.

16   Rana's office.  Tr. at 533-39.

17       On cross examination, Dr. West admitted that he could not say with certainty that the

18   fall in Dr. Rana's office was feigned, and that he certainly did not mean to indicate that her

19   fall could not have been idiopathic or psychosomatic in nature.  Tr. at 538-39.  Dr. West first

20   noted that the drop attacks really were not "equivalent" to epilepsy and that the comparison

21   was "a bit of a stretch."  Tr. At 539.  He went on, however, to state that he felt constrained by

22   the "Social Security pigeonholes" into which he was forced to "stuff these diagnoses," and

23   concluded that drop attacks occurring on a regular basis could take on the "functional

24   equivalency" of the 11.02 epilepsy listing.  <u>Id.</u>

25   / / /

26   / / /

27   _____

28       [10] Dr. West additionally indicated that plaintiff might be considered eligible for cardiac
     listing for arrhythmias.  Tr. At 534.  This possibility, however, was not much discussed by Dr.
     West either on direct or cross examination and does not appear to be at issue on appeal.

**D.  The ALJ's Decision**

_____By a decision dated November 29, 2002, the Administrative Law Judge denied plaintiff's claim.  See tr. at 212-18.  The ALJ found that plaintiff had not engaged in substantial gainful work activity since the onset of her claimed disability.  Tr. at 212.  Summarizing, the ALJ concluded as follows: "The medical evidence shows that the claimant has idiopathic drop attacks and anxiety which are severe impairments but which do not meet or equal the level of severity required by the Listing of Impairments . . ."  Id.  Moreover, the ALJ determined that her impairments did not "prevent the performance of her past work" or of similar work.  It was on this basis that the ALJ found that plaintiff was not disabled.  Id.

To support his conclusions, the ALJ first noted that Dr. West had concluded that plaintiff's injuries did not meet or equal the Social Security impairment listings.  Tr. at 213.  Throughout his opinion, the ALJ placed particular emphasis on the lack of "objective findings," such as CT scans, x-rays and the like, in the record that would support a finding of more serious impairment.  See tr. at 213-15.  He noted that while the record was replete with evidence of plaintiff having frequently sought treatment for various injuries sustained supposedly secondary to falls, treatment for the injuries had generally been "conservative" and did not reveal any serious organic limitations.  Tr. at 213.

The ALJ emphasized the numerous neurological examinations plaintiff underwent that failed to establish serious abnormalities, and noted Dr. Rana's conclusions as to plaintiff's ability to lift and carry objects and sit, stand, or walk in a relatively unlimited manner.  Tr. at 213-14.  The ALJ summarized the conclusions of the April 30 and September 21, 2001 Physical Residual Functional Capacity Assessment forms, conclusions quite similar to those of Dr. Rana.  Tr. at 214.

After cataloguing many of the examinations and tests plaintiff underwent, the ALJ discussed Dr. Matsumoto's conclusions in the June 17, 2002 Multiple Impairments Questionnaire.  Tr. at 213-15, 215.  The ALJ candidly described Dr. Matsumoto's conclusions as to plaintiff's severe limitations.  Tr. at 215.  He then concluded that "[t]he

13

United States District Court

For the Northern District of California

1   objective medical findings simply do not support such an extreme assessment." Id.  The ALJ

2   referenced the lack of any objective tests supportive of Dr. Matsumoto's assessment.  Id.

3       Turning then to plaintiff's mental state and condition of anxiety, the ALJ first noted

4   plaintiff's "lack of mental health treatment." Id.  He went on to describe Dr Carella's

5   psychological evaluation--an evaluation that ruled out generalized anxiety disorder, assessed

6   plaintiff's GAF at between 65 and 75, and found her to be in the low-average range of

7   intellectual functioning.  Id.  He additionally referenced Dr. Smith's Psychiatric Review

8   Technique Form as demonstrative of plaintiff's non-disability status.  Tr. at 215-16.  The

9   ALJ went on to give "minimal weight" to Dr. Matsumoto's assessment of plaintiff's mental

10  impairments in the October 14, 2002 Impairments Questionnaire.  Tr. at 216. The ALJ

11  indicated that Dr. Matsumoto's specialty was internal medicine and not psychology or

12  psychiatry, and that the assessment "exceeds Dr. Matsumoto's area of expertise."  Id.

13      Finally, the ALJ dismissed plaintiff's subjective claims as incredible.  Tr. at 216.

14  Specifically, he determined that plaintiff's "complaints regarding the frequency, severity, and

15  duration of her idiopathic attacks and diabetes mellitus are not consistent with the objective

16  medical evidence and are generally consistent with the limitations found."  Id.  Although

17  plaintiff stated that she was unable even to perform sedentary desk work, the ALJ noted that

18  she herself testified that she never has attacks while sitting, that numerous medical tests had

19  failed to indicate an organic ailment, and that her ability to drive an automobile suggested an

20  ability to perform sedentary desk work.  Id.  He dismissed the impact of her anxiety and

21  depression largely by referencing the totality of the record evidence and by again noting

22  plaintiff's failure to seek out psychiatric or psychological treatment.  Id.  In conclusion, the

23  ALJ determined that plaintiff retained "the residual functional capacity to perform a full

24  range of sedentary exertional work activity as defined by the Dictionary of Occupational

25  Titles and Social Security."  Id.  He found that plaintiff had the ability to return to her

26  previous work or function adequately in another sedentary office position.  Tr. at 217.

27  / / /

28  / / /

14

**United States District Court**

For the Northern District of California

**LEGAL STANDARD**

This Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record.  42 U.S.C. § 405(g).  A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence or if the decision is based on legal error.  <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995); <u>Magallenes v. Bowen</u>, 881 F.2d 747, 750 (9th Cir. 1989).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Andrews</u>, 53 F.3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ.  <u>Id</u>.; <u>Magallenes</u>, 881 F.2d at 750.  The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation."  <u>Andrews</u>, 53 F.3d at 1040.

In considering whether a claimant is entitled to benefits, an ALJ conducts a five-step sequential inquiry. 20 C.F.R. § 416.920.  At the <u>first step</u>, the ALJ considers if the claimant is engaged in substantial gainful activity; if the claimant is not engaged in substantial gainful activity, the <u>second step</u> asks if the claimant has a severe impairment (i.e. an impairment that has a significant effect on the claimant's ability to function); if the claimant has a severe impairment, the <u>third step</u> asks if the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the "Listings"); if the claimant does not have such a condition, the <u>fourth step</u> asks if the claimant is capable of performing his past relevant work; if the claimant is not capable of performing his past relevant work, the <u>fifth step</u> asks if the claimant is capable of performing other work which exists in substantial numbers in the national economy.  20 C.F.R. §§ 404.1520(b)-404.1520(f)(1).

**DISCUSSION**

Here, the ALJ found that plaintiff met the first step in the test, i.e., that plaintiff had not engaged in substantial gainful employment since the onset of her alleged disability.

United States District Court

For the Northern District of California

1    Plaintiff appears to have met the second step of the test as well, for the ALJ determined that

2    plaintiff's drop attacks and anxiety constituted "severe impairments."  It was at the third step,

3    according to the ALJ, that plaintiff's claim failed.  He found that her impairments did not

4    meet or equal those outlined in the listings of impairments.

5          At Step Three the ALJ must determine whether the severe impairments of the

6    claimant meet or equal an impairment included in the Administration's Listing of

7    Impairments.  See Stack v. Barnhart, 327 F. Supp. 2d 1175, 1176-77 (C.D. Cal. 2004) (citing

8    20 C.F.R. § 404.1520(d), 416.920(d)).  If the impairment meets or equals an impairment in

9    the Listing, disability is conclusively presumed and benefits are awarded."  See id.

10         While the ALJ determined that plaintiff's "idiopathic drop attacks and anxiety . . . are

11   severe impairments," he went on to find that her limitations "do not meet or equal the level

12   of severity required by the Listing of Impairments . . ."  Plaintiff attacks this determination

13   insofar as it was based on an erroneous interpretation of Dr. West's testimony.  Plaintiff

14   claims that Dr. West "unambiguously" testified to the equivalence of the impact of plaintiff's

15   drop attacks to the impact of the section 11.02 listing for epilepsy.

16         While Dr. West's testimony was not unambiguous, his ultimate conclusion that

17   plaintiff's condition was "functionally equivalent" to section 11.02 should not have been

18   dismissed so easily.  Dr. West was not questioned regarding the basis for his uneasiness

19   regarding his conclusion.  Indeed, it is clear that he may not have understood the legal

20   definition of "equivalence."  Cf. Tr. 539 ("Equivalence is a term you guys use . . .") with id.

21   ("I would say that's a functional equivalent of that.  I like that term.  Yes."); see also 20

22   C.F.R. § 404-1526(a) (stating that equivalence exists "if the medical findings are at least

23   equal in severity and duration to the listed findings").  Even though it was ultimately within

24   the ALJ's discretion to make a determination regarding equivalence, the heavy reliance

25   placed on Dr. West's tentativeness was not well-placed.

26         The Court is also troubled by the fact that the ALJ seemed to resolve the

27   ambiguousness of Dr. West's testimony in part by discrediting plaintiff's testimony

28   concerning the frequency and severity of her falls.  He stated that plaintiff's "complaints

regarding the frequency, severity and duration of her idiopathic attacks . . . are not consistent with the objective medical evidence . . ." His conclusion is belied by an abundance of evidence in the record establishing consistent treatment for injuries secondary to falls. The record is replete with documentary evidence of trips to the doctor, trips to the emergency room, and frequent treatment for falls varying in severity. Even if petitioner's subjective accounts were ignored entirely, the objective record of significant physical injuries to her head and hip, in addition to repeated hospital visits would still provide strong support for her claim. In light of this substantial evidence, it would have been unreasonable to conclude that petitioner's condition was entirely feigned. That doctors could not pinpoint an organic cause for her attacks and differed as to her physical work limitations does not mean that plaintiff was not credible in describing her ailments. Whatever the cause of petitioner's condition, it cannot be disputed that it produced objective physical injuries and alteration in petitioner's ability to carry on a normal life. Insofar as the ALJ was able to resolve the ambiguity of Dr. West's testimony by discrediting plaintiff, his failure to do so without considering this objective evidence was error.

In addition, the ALJ's seems to have improperly fragmentized his analysis of plaintiff's multiple impairments. At the Third Step, the Administration's duty is to consider all of the claimant's impairments in their totality. "If a claimant has more than one impairment, the Commissioner must determine 'whether the combination of [the] impairments is medically equal to any listed impairment.'" Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (citing 20 C.F.R. § 404.1526(a)). "The claimant's symptoms 'must be considered in combination and must not be fragmentized in evaluating their effects.'" Id. (citing Lester v. Chater, 81 F.3d 821, 829 (9th Cir.1995) (citations omitted)).

Here, the plaintiff presented evidence of impairments of both a physical and mental nature. On the one hand, plaintiff presented medical evidence of moderate physical limitations relating to her weight and diabetes. Injuries sustained from the falls that plaintiff repeatedly experienced, however, seemed more severely to limit her work functionality. The injuries sustained from falls, in turn, were interwoven with plaintiff's mental state. In other

17

United States District Court

For the Northern District of California

words, the evidence suggests strongly that plaintiff's mental state may explain--at least in part--the drop attacks she experiences.  This possibility should have been considered by the ALJ.  See Beecher v. Heckler, 756 F.2d 693, 695-96 (9th Cir. 1985) (finding ALJ erred by not considering combined effects of physical and psychological impairments).

In determining that plaintiff's conditions did not meet or equal the Administration listings, however, the ALJ placed much emphasis on plaintiff's physical condition and on the failure of doctors to pinpoint an organic cause of her falls.  See tr. At 213-15.  The ALJ appeared to compartmentalize his analysis of plaintiff's anxiety and mental state, minimizing the impact of her mental condition by admonishing her for failing to seek out psychiatric or psychological treatment.

With a case such as plaintiff's, where her physical ailments seem to intricately linked to her mental state, the ALJ erred in fragmentizing consideration of her physical and mental problems and by focusing on a lack of medical evidence indicating a physical cause for her attacks.  And while physicians' assessments of plaintiff's mental state varied as to their impact on work function, all seemed to agree that plaintiff suffers from some degree of mental impairment.

The ALJ then compounded the error by relying on plaintiff's failure to seek out professional mental health treatment to minimize the impact of her mental state.  First of all, the ALJ's conclusion that plaintiff failed in this regard seems rebutted by record evidence documenting her own treating physician's attempts to treat her mental problems and by the fact that she has for several years been prescribed Paxil.

Assuming, however, that such steps cannot properly be considered professional mental health treatment, the Ninth Circuit Court of Appeals has cautioned against relying on such evidence to discredit claims relating to mental health. See Regennitter v. Commissioner of the Social Security Administration, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) (citing Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)).  As the Regennitter court noted:

> we have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because "'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'"

18

Id. (quoting Nguyen, 100 F.3d at 1465 (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir.1989))).  It was error for the ALJ to rely, at least in part, on plaintiff's failure to secure professional mental health treatment to reject her claims relating to her mental state.

For the foregoing reasons, the Court concludes that the ALJ's determination that plaintiff's impairments did not meet or exceed the listing for impairments was not supported by substantial evidence.  Cumulatively, the ALJ's errors throw into doubt his decision to ignore Dr. West's ultimate conclusion.  In the absence of legitimate conflicting testimony, the examining physician's opinion may only be rejected only for clear and convincing reasons.  See Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Andrews, 53 F.3d at 1041. The ALJ has failed to meet this burden.

Because the Court remands as to the Step Three analysis, there is no need to reach plaintiff's arguments as to the ALJ's determinations at Step Four and Step Five.

## CONCLUSION

The Court therefore remands the matter to the Administration for further determination as to whether, taken as a whole, plaintiff's impairments meet or exceed the listings.  On remand, the Administration is ordered to consider more carefully plaintiff's mental state and the interconnection between her mental impairments and her physical limitations.  It is also ordered to consider any and all listings that a combination of plaintiff's physical and mental symptoms may meet.  See, e.g., Listing of Impairments--Adult Listings § 12.07 (listing a condition that includes symptoms such as "psychogenic seizures" accompanied by social dysfunction and difficulties in concentration).  Without proper consideration of this evidence, the Court cannot properly analyze plaintiff's claims.

**IT IS SO ORDERED.**


Dated: June 30, 2005

_____
              /s/
CHARLES  R.  BREYER
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California